## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

DIANA QUEVEDO,

        Plaintiff,

        v.

TOP-LINE FURNITURE WAREHOUSE
CORP. d/b/a HOMELEGANCE BY
TOP-LINE FURNITURE WAREHOUSE,
d/b/a TOP-LINE PRODUCTS, LTD.,

        Defendant.

Case No. 16-cv-5991

Judge John Robert Blakey

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Diana Quevedo sued her former employer, Defendant Top-Line Furniture Warehouse Corporation, for discrimination under Title VII, 42 U.S.C. § 2000(e) *et seq.*, and 42 U.S.C. § 1981 (Counts I and II); violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (Count III); violations of the Equal Pay Act, 29 U.S.C. § 209(d) (Count IV); violations of the Illinois Human Rights Act, 775 ILCS 5/2-101 *et seq.* (Count V); and violations of the Illinois Wage Payment Collection Act, 820 ILCS 115/1 *et seq.* (Count VI). [1]. Defendant moved for summary judgment. [26]. For the reasons explained below, Defendant's motion is granted in part and denied in part.

## I. Background

### A. Plaintiff's Employment

Plaintiff is a Hispanic woman of Mexican origin. *See* DSOF ¶¶ 8–9; [28] at

4.[1] She holds Bachelor of Science and Master's degrees in Business Administration from DeVry University; she obtained her Bachelor's with a concentration in accounting. *See* [39-5] at 2. Before working for Defendant, Plaintiff worked as a machine operator and as a banquet server. *See id.* at 3. Plaintiff continued her catering work part-time after Defendant hired her in 2010. *See id.*; [37] at 13. Her current resume states that she has "[e]xperience with Microsoft Office, Outlook, Netsuite, Blackline and People Soft." [39-5] at 3.

Plaintiff worked for Defendant from June 2010 to December 2015 in a variety of positions. DSOF ¶ 4. Plaintiff started as a customer service representative, reporting to Joann Chan. [36-3] at 8. Plaintiff then became a customer service operations supervisor in 2013 before transferring to Defendant's shipping and receiving department in early 2015. *Id.* In both of these positions, she reported to Max Liaw, Defendant's office manager. *Id.*; DSOF ¶ 8. In April 2015, Plaintiff transferred to Defendant's accounting department, under the supervision of Adriana Castro, who reported to Liaw. [36-3] at 8; DSOF ¶ 8.

Plaintiff testified that while she held the operations supervisor position, Defendant treated her less favorably than Chan, then the advertising supervisor. [37] at 15. Plaintiff claims that Liaw and Chan often overruled her decisions, while Liaw never overruled Chan. *See id.* Plaintiff also testified that Defendant gave Chan opportunities to travel to "expos" that Defendant denied to Plaintiff. *Id.* at 16.

---

[1] The facts come from the parties' Local Rule 56.1 statements. DSOF refers to Defendant's statement of undisputed facts [27], with Plaintiff's responses [35] cited as R. DSOF. PSAF refers to Plaintiff's statement of additional undisputed facts [35], with Defendant's responses [47] cited as R. PSAF. References to additional filings are by docket entry number.

Finally, Plaintiff claims that Defendant paid Chan more than her, even though Chan's position as advertising supervisor was "pretty much" the same position as Plaintiff's. *Id*. at 15, 18. Chan's employment is discussed further below; as to pay, Chan earned more than Plaintiff at various times, but the record contains only raw salary data and does not clearly indicate responsibility, performance, or experience levels. *See* [38-4]. The record also shows that when Defendant hired Plaintiff, Chan held a more senior position. *See* [36-3] at 8. Plaintiff's testimony as to Chan's pay is based upon a statement by Liaw that, as operations supervisor, Plaintiff could not earn *more* than Chan. *See* [37] at 18. Together with Defendant's president, James Wuang, Liaw set Defendant's pay rates. PSAF ¶ 9; R. PSAF ¶ 9. Wuang is Taiwanese and Liaw is of Chinese-Malaysian descent. R. PSAF ¶ 1.

Plaintiff also testified that, before she joined the accounting department, Defendant frequently moved her through different positions, making her fill in for recently terminated employees. [37] at 13. Plaintiff appears to refer specifically to her work in shipping and receiving. *See id*.; PSAF ¶ 1. She testified that only she and a male Hispanic employee had to fill gaps in this way, and that during this time she lacked a titled position. [37] at 14–15.

In April 2015, Plaintiff joined the accounting department. DSOF ¶ 5; [36-3] at 8. There, she applied customer payments to their accounts, issued debit and credit memos, entered invoices in Defendant's accounting system, handled vendor disputes, resolved accounting discrepancies and various payment issues, and prepared and submitted accounts receivable reports and monthly commissions

reports.  DSOF ¶ 5; PSAF ¶ 33; [36-1].  Fulfilling these duties required Plaintiff to use Microsoft Excel and NetSuite accounting software.  *See* PSAF ¶ 33.

When Plaintiff moved to accounting, she asked Wuang if she could start at 7:00 a.m. rather than the usual 8:30 a.m. and end her day early.  [29-5] at 6; DSOF ¶ 33.  Plaintiff explained that she wanted this schedule to accommodate a part-time job.  [29-5] at 6.  At the time, Plaintiff still worked part-time catering jobs.  [37] at 13.  Wuang approved her request.  *Id*.; [29-5] at 6.

Initially, the accounting department consisted of three Hispanic women: Plaintiff, her coworker Erika Hernandez, and their supervisor, Adriana Castro.  DSOF ¶¶ 8, 9.  Castro is Mexican, like Plaintiff.  [37] at 18.  Frank Slad, who joined accounting in November 2015, was the only white male in the department during the relevant period.  *See* DSOF ¶¶ 10, 13; PSAF ¶ 16; R. PSAF ¶ 17; [36-3] at 7.

In June 2015, Plaintiff suffered a non-work-related car accident.  DSOF ¶ 34.  Plaintiff's injuries included a bruised elbow, whiplash, and a herniation in two lumbar discs.  *Id*. ¶ 35; [37-5] at 10.  From June through August, Plaintiff received treatment from Dr. Jacqueline Martinez, a chiropractor, as well as from a pain management specialist.  DSOF ¶ 35; [37-5] at 10–11.

Plaintiff claims that Castro refused to let her attend a physical therapy session on one unspecified occasion.  R. DSOF ¶ 40; [37] at 21.  Plaintiff admits, however, that on that occasion she still attended her session, and in fact, she never missed a doctor's appointment.  *See* R. DSOF ¶ 39; [37] at 21.  Martinez testified that Plaintiff's condition improved in July, and Martinez released her from

treatment on August 31. DSOF ¶¶ 36–38; [37-5] at 5–6, 8. By then, Plaintiff's neck and shoulder injuries had resolved and her elbow and back injuries had stabilized, meaning that although disc herniation is a permanent condition, Plaintiff's symptoms had abated and further treatment was not required at that time. DSOF ¶ 38; [37-5] at 6, 10–11.

After her car accident, Plaintiff sought various accommodations from Castro.[2] *See* [37] at 21–22. Specifically, she requested a different chair and leave to attend her doctor's appointments; Castro granted both requests. *See* R. DSOF ¶ 44; DSOF ¶¶ 42–44. Plaintiff also discussed her injuries with Castro, saying that she would need "a little bit more time" to do her job because of problems with her left hand. [37] at 21; DSOF ¶ 41. Specifically, Plaintiff says that she could not use her left hand to flip through hard copies of data, so she had to use her mouse to switch windows on her computer monitor, which took longer. [37] at 22; DSOF ¶ 41. Castro never interfered with Plaintiff's use of this method. [37] at 22; DSOF ¶ 41. Plaintiff does not indicate when or how long she had to work this way. *See* [37] at 21–22. Plaintiff requested no further accommodations. *See* R. DSOF ¶ 44.[3]

---

[2] Plaintiff now claims that Wuang and Liaw handled her requests for accommodation. PSAF ¶ 4. But Plaintiff cites Wuang's deposition, where he states only in general terms that he and Liaw discussed Plaintiff's injury, and he appears to confuse a request for accommodation with Plaintiff's request to change her schedule in April 2015. *See* [37-3] at 17–18. Liaw merely testified that in 2015 Defendant lacked a separate human resources department, so he generally handled human resource policy. *See* [38] at 12. Absent contrary evidence, this Court accepts Plaintiff's testimony that she only ever spoke to Castro about her requests. *See* [37] at 21.

[3] Plaintiff now claims that she also asked Defendant for a "modified work schedule" to attend doctor appointments. R. DSOF ¶¶ 40, 44. But Plaintiff cites her own testimony, which refers only to the single instance on which Castro allegedly denied Plaintiff's request to attend a physical therapy appointment, which Plaintiff admits she attended anyway. *See* [37] at 21; R. DSOF ¶¶ 39, 40. The record does not show that Plaintiff ever requested a "modified schedule"; rather, she requested (and got) periodic time off to attend her appointments. *See* [37] at 21–22.

Throughout her tenure in accounting, Plaintiff normally texted Castro about her absences or delayed start times. DSOF ¶ 46. Plaintiff's text messages show that she often texted Castro on the day that she planned to take off, sometimes waiting until after her normal start time. *See id*. ¶¶ 47–54, 56, 58, 59, 60, 61, 62. One of these requests predates Plaintiff's car accident. *See id*. ¶ 47; [29-3] at 2. Several requests coincide with Plaintiff's treatment period, but not all relate to her injuries. *See* DSOF ¶¶ 51, 53 ("I'm running late today. My flight just leaving from Colorado."); ("I have to take my Dad to get some tests in the morning."). In September and October—following Plaintiff's release from treatment—Plaintiff requested additional days off, most of which did not relate to her condition. *See id*. ¶¶ 56, 58, 59 (missing work to babysit a friend's grandchildren; because of a head cold; because of a sore throat).

In mid- or late September, Castro warned Plaintiff that even though she knew some of Plaintiff's absences related to her health, "we have to not let our personal life interfere with our job." DSOF ¶ 57; [29-1] at 10. Castro also asked Plaintiff to send absence notices by email rather than text. DSOF ¶ 57. On September 24, Plaintiff acknowledged—by text—that Castro preferred that she report lateness and absences by email, while notifying Castro that she would be late the next day. *See* [29-3] at 17. Despite Castro's instructions, Plaintiff continued to report lateness and absences by text. *See id*. at 18–22; [29-4] at 1–3.

In early October, Defendant either offered or ordered Plaintiff to transfer from accounting to the position of parts supervisor in Defendant's warehouse. *See*

R. DSOF ¶ 29; [37] at 47. Plaintiff wrote to Wuang on October 12, saying that she had considered the new job and had decided to decline it. [29-5] at 7–8. She told Wuang that her current position allowed her to keep her second, part-time job, and that even if she had not yet fully learned her duties in accounting, she hoped to have more time to do so. *Id*. at 8. Wuang responded that transfer decisions turned on what was in Top-Line's best interest, and where employees could best meet their potential. *Id*. at 7. He indicated that Plaintiff's schedule could be adjusted for her second job, but that the transfer was ultimately Defendant's decision. *Id*. He said he would inform Plaintiff of her transfer date. *Id*. But Defendant never transferred Plaintiff, who remained in accounting until her termination. *See* DSOF ¶¶ 5, 29.

Wuang testified that the potential transfer represented a promotion, but indicated that he also offered it in response to problems between Plaintiff and Castro, stating: "I just listen because Adriana [Castro] work with me more than 15 years." [37-1] at 10–11. The transfer offer—or order—occurred around the same time as an October management meeting, during which Castro reported on her staff's performance. *See* [36] at 8. Castro does not recall the meeting exactly, but believes that she mentioned problems with Plaintiff's performance, including difficulty getting along with her coworkers and lack of cooperation. *Id*. at 24. On a handful of other occasions, Castro spoke to Liaw about Plaintiff's negative attitude and described Plaintiff as "uncooperative." *Id*. at 17–18. Castro also considered the proposed transfer a promotion since it was to a supervisory position. *Id*. at 24.

In November, Defendant hired Frank Slad for the accounting department. DSOF ¶ 13. The parties dispute Slad's exact role. They agree, however, that Slad reported to Liaw rather than to Castro, and on occasion to Felix Wuang, Defendant's vice president for finance and accounting. R. DSOF ¶ 20; PSAF ¶ 1. The parties also agree that Defendant tasked Slad with creating a more efficient method of processing customer payments. R. DSOF ¶ 15; [36] at 11–12. Defendant states that Plaintiff refused to use Slad's method. DSOF ¶ 22.

Plaintiff contends that Slad did not finalize his new method until after her termination. *See* R. DSOF ¶ 17. In her deposition, Plaintiff said that Slad did not "introduce" her to a new method of applying payments but that she was not "surprised" that Slad said that he did. *See* [37] at 23. For his part, Slad testified that he spent November and December developing his system, which involved creating new Excel templates, and completed it by the end of 2015. [36-2] at 20, 21. But Slad and Castro also recount that before the templates were complete, Slad devised other, interim efficiencies for Defendant's payment process, mainly using more complex Excel formulas. *See id.* at 17; [36] at 13. They describe Plaintiff's reluctance to change her method of entering payments. *See* [36-2] at 17–18; [36] at 13–14, 15. Slad stated that he showed Plaintiff these procedures but that she was not "engaged" and did not "want to actually do it that way," which slowed down her work. [36-2] at 18. Plaintiff says that Slad's methods took her the same amount of time as her original method, *see* R. DSOF ¶ 23, and fails to otherwise address Defendant's contention that she refused to use Slad's interim procedures.

Throughout the fall of 2015, Defendant contends that Plaintiff's performance suffered. Castro testified that, in addition to Plaintiff's interpersonal difficulties and reluctance to adjust her accounting procedures, she was untimely in "following up with customers on disputes" or unpaid invoices. DSOF ¶ 24; [36] at 14. Plaintiff also failed to timely complete accounts receivable reports, despite Castro's reminders. [36] at 14. Plaintiff contends that her injuries caused her untimeliness. R. DSOF ¶ 24. The record indicates that Plaintiff did not affirmatively seek additional time to complete tasks but rather asked for extensions when Castro followed up with her on delayed items. *See* [36] at 14; [37] at 22.

Castro also testified that Plaintiff's repeated absences caused the accounting department's work to pile up. [36] at 25–26. Plaintiff contends that other factors "caused inefficiencies" in the department, including "issues with Defendant's computers and software." R. DSOF ¶ 45. In addition to the absences already discussed, Plaintiff requested a sick day in November because her back hurt. DSOF ¶ 60. On December 8, Plaintiff texted Castro: "I don't feel good. I will take a day off." *Id.* ¶ 61. Plaintiff also took a vacation from December 17 to December 23; on December 16, she wrote to Wuang requesting a twelve-day vacation in January. *Id.* ¶¶ 63–64; [29-5] at 4. In total, between June 21, 2015, and December 31, 2015, Plaintiff missed 13 days of work and arrived late on 7 days. DSOF ¶ 65. Four of Plaintiff's absences comprised her vacation in late December; five were for personal reasons; and four related to her injuries from the car accident. *Id.*

In mid-December Plaintiff received her annual performance review. *See* [39-3] at 2; [36] at 8. Liaw completed her evaluation. *See* [39-3] at 2. Although Castro recalled completing an evaluation for Plaintiff around the same time, [36] at 8–9, Defendant found no record of any such document, as stated in open court, *see* [21] at 5; [24]. Liaw believes he completed the evaluation because Plaintiff—having transferred into accounting in April—had not worked for Castro during the full year under review. *See* [38] at 17–18. Liaw incorporated feedback from Slad and Castro into his review, specifically with respect to Plaintiff's refusal to adopt Slad's efficiency measures and her poor attendance. *Id.* at 19, 20. He noted that an employee's request for vacation when their department is behind on a project negatively affects their attendance score. *Id.* at 20. The evaluation rated Plaintiff at 50% or less for her quality of work, quantity of work, work habits, and communication, and at 60% for attendance. [39-3] at 2. The review states that Plaintiff's performance had declined, that her attendance was below standard, and that she was "uncooperative." *Id.*

The parties agree that before 2015, Plaintiff received merit-based raises and a discretionary bonus. *See* PSAF ¶¶ 20–21; [27-1] at 17. But she also received prior critical reviews. When Plaintiff worked under Chan in customer service, one review noted that Plaintiff needed "to be more positive." *See* [29-9] at 168–72; [38-7] at 21–22. The same review gave her low marks in work habits and communication. [38-7] at 20–21. Plaintiff's 2014 review does not appear in the record, but Liaw testified that he completed that review as her superior for the operations supervisor job. [38]

at 24. That review criticized Plaintiff's lack of leadership, poor attendance, and failure to complete weekly reports, and noted that Defendant received a complaint from a "major client" about Plaintiff's work. *Id*.

On December 31, 2015, Defendant fired Plaintiff. [37-1] at 2. Liaw signed her termination letter, which stated that Defendant had decided "to eliminate the position you presently hold." *Id*. Liaw drafted it using a template he found online. [38] at 46. Liaw testified that eliminating Plaintiff's position meant eliminating a position for someone with Plaintiff's skills, since Slad's new methods made her exact role unnecessary. *Id*. at 22. Defendant does not maintain standardized job descriptions. *See id*. The parties agree that after Plaintiff's termination, Slad assumed some of her tasks, though Defendant states that he did so using his improved procedures. *See* R. PSAF ¶ 15. Defendant contends that Castro, Hernandez, and others also absorbed some of Plaintiff's duties. [36-3] at 7; [36] at 32–33. When Defendant fired Plaintiff, she earned $21.32 per hour. DSOF ¶ 6.

## B. Accrued Leave

From October 2013 to July 13, 2015, Defendant's applicable employee handbook (the 2013 Handbook) awarded employees five days of vacation after one year of employment. *See* DSOF ¶ 31; [27-1] at 1, 6. Beginning July 13, 2015, Defendant's revised handbook (the 2015 Handbook) granted longer serving employees additional vacation time. *See* DSOF ¶ 32; [27-1] at 28, 31, 55–56. Employees with 5 years of service—like Plaintiff—received 14 days of paid vacation, 2 days of personal leave, and 3 days of sick leave. DSOF ¶ 32. Plaintiff started with Defendant on June 21, 2010; thus, she reached five years' employment on June

21, 2015.[4]  *See id.* ¶ 4.  Accordingly, by July 2015, Plaintiff was entitled to 14 days paid vacation, 2 days of personal leave, and 3 days of sick leave.  *See id.* ¶ 32.

From June 2014 to June 2015, Plaintiff used eight vacation days and three sick days.  *Id.* ¶ 66; R. DSOF ¶ 66.  The eight vacation days represented the five per year she was entitled to under the 2013 Handbook, plus three carried over from the 2013–2014 anniversary year.  DSOF ¶ 66.  As such, according to Defendant, Plaintiff used up her leave for the period preceding June 2015.  *Id.*

When Defendant adopted its new leave policy in July 2015, Plaintiff became entitled to 14 days' paid vacation under the terms of the 2015 Handbook.[5]  *See* DSOF ¶¶ 4, 32; [27-1] at 56.  The parties agree that, between June 21 and December 31, 2015, Plaintiff used eight days of vacation, two personal days, and three sick days.  *See* R. DSOF ¶ 67.  Thus, by the time of her termination, Plaintiff had used all her personal and sick days, but retained six days of unused vacation.  *See id.*; [27-1] at 55–56.  Defendant says that it paid out these six days in Plaintiff's post-termination checks.  DSOF ¶ 68; [27-1] at 2.  The record does not contain Plaintiff's post-termination checks.  But Plaintiff's final earnings statement shows

---

[4] Although the parties do not expressly say so, it appears that Defendant calculated benefits based upon each employee's individual start date rather than the calendar year; thus, Plaintiff's "anniversary years"—and her overall tenure—were calculated from her June 21, 2010 hire date.  *See* DSOF ¶¶ 4, 65–67.

[5] Plaintiff argues that she was owed 16 vacation days in her 2014–2015 anniversary year, and 14 at her termination, in her 2015–2016 anniversary year.  R. DSOF ¶ 68.  But the evidence that Plaintiff cites does not contain her full pay history and in no way indicates what leave policy governed her vacation accrual in any given year.  *See id.*; [38-1].  The record does not support Plaintiff's claims that she was owed 12 vacation days in 2013–2014; 13 days in 2014–2015; or that she received no pay for vacation days in 2014.  *See* [38-1]; R. DSOF ¶¶ 66, 68.  This Court disregards these insufficient denials of Defendant's statements of fact.  *See Roberts v. Advocate Health Care*, 119 F. Supp. 3d 852, 854–55 (N.D. Ill. 2015) (disregarding unsupported denials); *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000) (denials must cite specific evidence justifying the denial or provide an explanation if the cited material "does not clearly create a genuine dispute" of fact).

that Defendant paid her for 10 unused vacation days in January 2016. *See* R. DSOF ¶ 68; [38-2]. Defendant does not explain why it paid Plaintiff for 10 days' unused vacation when its records consistently show that Plaintiff used 8 of the 14 she was owed after June 2015. *See* [27-1] at 64–65; [29-9] at 109.

### C. Additional Alleged Discrimination

Plaintiff alleges generally that Defendant treated Asian employees more favorably than non-Asian employees, citing her own testimony as well as that of Slad and Hernandez, Plaintiff's coworkers in accounting. *See* PSAF ¶ 37.

In his deposition, Slad stated generally that he believed Defendant treated individuals "of Chinese origin" more favorably than others. [36-2] at 9. Hernandez testified that white and Asian employees—but not Hispanic employees—took breaks without being reprimanded. *See* [36-4] at 7. But Hernandez's examples consisted of employees outside the accounting department, and the reprimands came from Maria Mendoza, a senior Top-Line employee who is Hispanic. *Id.* Hernandez also recanted an earlier statement alleging that Defendant gave non-Hispanic employees more favorable leave policies. *See id.* at 8. Finally, Hernandez testified that non-Hispanic employees were allowed flexible start times; however, she also stated that Hispanic employees worked flexible schedules with Defendant's prior approval, and she did not know if the non-Hispanic employees also received such approval. *See id.* at 8–9.

Plaintiff testified that non-Hispanic employees received more flexible hours, but acknowledged that the examples she cited—Natalie Ong, Stephanie Sullivan, and Liaw—held managerial positions outside the accounting department. *See* [37]

at 17; R. DSOF ¶ 72. Plaintiff further testified that Defendant prioritized granting vacation to Chan and Castro over her, and stated that Defendant once asked her to return to work after being on leave for surgery because Chan was going on vacation. [37] at 17. Finally, Plaintiff testified that Defendant permitted Chan, Ong, and Sullivan to work from home. R. DSOF ¶ 72; [37] at 18. Plaintiff does not claim that she or any other Hispanic employee asked to work from home and had their request denied. *See generally* R. DSOF; [37].

Plaintiff states that Defendant has fired at least 37 employees since her termination, of whom at least 31 have Hispanic surnames. PSAF ¶ 13. In support, Plaintiff offers two undated lists of individuals who left Defendant's employ between December 2015 and August 2016. [39-2] at 2–3. Of these employees, three are listed as having resigned; three failed to show up for work; and two entries give no indication as to whether the employee resigned or was terminated. *See id.* Of the 29 employees clearly listed as "terminated," 24 have names that appear to be of Hispanic origin. *See id.* Neither party's statement of facts contains information on Defendant's total number of employees, the demographics of Defendant's workforce, or the rate of turnover among Defendant's employees.

Plaintiff also alleges that Defendant paid Asian employees more than non-Asian employees. PSAF ¶¶ 10, 11, 18. In support, Plaintiff cites a summary of pay histories for Castro, Hernandez, Chan, Slad, Plaintiff, and Cecilia Baldo-Vongphakdy, who joined Defendant after Plaintiff's termination. *See id.*; [38-4]. The summary shows that these individuals earned different rates over the course of

their employment, in different positions and different levels of seniority. *See* [38-4].

Plaintiff next contends that upon her termination, Defendant filled her role with white and Asian employees. *See* PSAF ¶¶ 15–16. When Plaintiff was terminated, Slad, Hernandez, and Castro remained in the accounting department. *See* [36] at 32; [36-2] at 16; DSOF ¶¶ 8–10. Castro testified that Plaintiff's various tasks were distributed among herself, Slad, Hernandez, Chan, and Mendoza. *See* [36] at 32–33; [36-1] at 2. Slad and Hernandez both testified that Slad "took over" Plaintiff's role following her termination. [36-2] at 16; [36-4] at 13.

Defendant fired Slad in May 2016 for absenteeism. DSOF ¶ 21. Hernandez resigned in June 2016. *Id*. ¶ 12.[6] Defendant hired Vongphakdy (who is a Southeast Asian woman) in April 2016 and Jingshu Wu (who is Asian)[7] in June 2016. *See* PSAF ¶ 16; R. PSAF ¶ 17; [36-3] at 7. At some point Defendant also briefly hired Nadia Hurma (a non-Asian woman) through a temp agency, though she did not remain with Defendant for very long. *See* PSAF ¶ 16; R. PSAF ¶ 17. Defendant paid both Wu and Vongphakdy less than it paid Plaintiff while she worked in accounting. *See* PSAF ¶ 17; DSOF ¶ 6; [38-4]. Defendant stated that some of Plaintiff's other duties are also now handled by Pam Sheldon, a white woman whom Defendant hired as an accounting supervisor. *See* [36] at 7; [36-3] at 7.

Plaintiff asserts that various other acts by Defendant demonstrate gender

---

[6] Plaintiff alleges that Hernandez resigned because Defendant "applied its vacation policy" discriminatorily. R. DSOF ¶ 12. Hernandez testified that she resigned because she was frustrated with Defendant's leave policy when Mendoza denied her request for time off. [36-4] at 17.

[7] Defendant previously identified Wu as a man; Defendant now states that Wu is a woman. *See* R. PSAF ¶ 16; [36-3] at 7. This discrepancy does not affect this Court's analysis.

discrimination. *See* R. DSOF ¶ 71. First, she testified that Defendant offered an employee named Alberto Landeros a bonus when he left Defendant's employ in 2015 but never offered her one upon her termination. [37] at 26. Next, Plaintiff contends that Defendant gave written performance reviews only to female employees. R. DSOF ¶ 71. But Plaintiff bases this upon testimony from Wuang, in which he merely states that Liaw and Alex Wuang received verbal evaluations; that Slad did not work for Defendant long enough to receive an evaluation; and that otherwise all staff in Defendant's office received a written review. *See* [37-3] at 12–13. Finally, Plaintiff claims that Defendant did not transfer male employees as frequently as it transferred her. R. DSOF ¶ 71. She bases this upon Wuang's testimony, who states only that the number of transfers Plaintiff received was unusual, [37-3] at 11, and Liaw's similar testimony, [38] at 22. Plaintiff's own testimony describes Alex Aviles, a Hispanic man, being transferred in the same way as Plaintiff. [37] at 14.

Finally, Plaintiff notes that Defendant settled a discrimination claim brought by a former female Hispanic employee in 2012. PSAF ¶ 35; R. PSAF ¶ 35.

### D. Comparators

Plaintiff identifies two potential comparators: Slad and Chan. *See* [34] at 7–8, 10. Slad joined the accounting department in November 2015. DSOF ¶ 13. Defendant states that it paid Slad $0.80 more per hour than it paid Plaintiff. *See Id.* ¶¶ 6, 13; [28] at 5. Slad, Castro, and Liaw testified that Defendant hired Slad to improve the efficiency of its accounting procedures and to conduct various data analysis projects for Defendant. *See* [36-2] at 9, 11–12; [36] at 18; [38] at 19.

The only description of Slad's position with Plaintiff is Defendant's Craigslist posting advertising the job. [36-2] at 9; [34] at 7. That posting called the position "Account Payable and Receivable Accountant Assistant," and noted that pay would be based upon "qualifications and job experience." [29-8] at 73. The position required at least one year of accounting experience and an accounting degree. *Id.* at 73, 74. It described the position's tasks as including, among other things, updating vendor and customer records in Defendant's NetSuite software; issuing customer statements; and processing accounts payable and receivable transactions. *Id.* Slad testified that in his hiring interview, Liaw "focused more on the Excel and data portion" of the position rather than the "cash-handling portion of the position." [36-2] at 12. Slad stated: "The accounting department needed help and they wanted someone" with "a data background or more Excel knowledge because they really didn't have that skillset in their employee base at that time." *Id.*

Slad's resume states that, as of at least May 2015, he had "10 years of management experience," "highly advanced" Excel skills, and experience "developing efficient processes." [29-8] at 35. Before joining Defendant, he worked as an auditor, financial coordinator, and manager at various companies in the Chicago area. *Id.* at 35–36. His last job was a management-level position in the analytic unit of a company providing data analysis to corporate clients. *See id.* Slad holds an Associate's degree in accounting from College of DuPage and a Bachelor's degree in accounting from the University of Illinois at Chicago. *Id.* at 36.

In late 2015 or early 2016, Mendoza took on more of Defendant's human resources responsibilities and gained greater authority within the company. *See* [36-2] at 6; [36-4] at 7–8, 10, 17; [36] at 43–45. In early 2016, Mendoza issued Slad two written warnings for violations of company policy. [36-2] at 5–7. One of these stated that Slad was "placed on performance improvement," but Defendant never initiated any kind of improvement plan with Slad. *Id*. at 7. Plaintiff contends that Defendant granted Slad 23 days of unearned vacation, R. DSOF ¶ 71, but the time sheets she cites in support show only unexplained absences, *see* [39-7]. Defendant fired Slad in May 2016, partly because of "excessive absenteeism." DSOF ¶ 21.

Chan worked with Plaintiff in Defendant's customer service department. [36-3] at 8; [37] at 15. Chan was initially Plaintiff's superior, though both women later held supervisory roles: Chan as advertising supervisor, and Plaintiff as operations supervisor. *See* [36-3] at 8; [37] at 15. In those positions, both women reported to Liaw. *See* [36-3] at 8; [37] at 15. Chan appears to have started working for Defendant around 2006. *See* [38-4] at 2. Neither Chan's resume, prior work experience, or any description of her positions with Defendant appear in the record. Nor does either party state her national origin or ethnicity, though Castro testified that Chan speaks Chinese. [36] at 17. One undated performance review for Chan rated her at 90% or higher in every evaluation criterion; an additional remarks section also noted: "Can be difficult to work with sometime but improved a lot." *See* [38-7]. Finally, the parties agree that Defendant offered some employees loans in the form of advanced compensation, including Chan. PSAF ¶ 34; R. PSAF ¶ 34.

**D.    This Case**

After her termination, Plaintiff filed charges with the Equal Employment Opportunity Commission (EEOC) and the Illinois Department of Human Rights, which issued notices of her right to sue around April 2016.  DSOF ¶ 2; [1-1].  In June 2016, Plaintiff sued Defendant for various types of discrimination and unpaid vacation hours.  [1].  This opinion addresses Defendant's motion for summary judgment on all counts.  [26].

## II.    Legal Standard

Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether a genuine issue of material fact exists, this Court construes all facts and reasonable inferences in the light most favorable to the non-moving party.  *See CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014).  The non-moving party has the burden of identifying the evidence creating an issue of fact.  *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008).  To satisfy that burden, the non-moving party must do more than create "some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, "there

must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252. The moving party is entitled to summary judgment where the non-moving party fails to establish an "essential element" of the case for which that party has the burden of proof. *Celotex*, 477 U.S. at 323; *see also Montgomery v. Am. Airlines*, 626 F.3d 382, 389 (7th Cir. 2010).

## III. Analysis

Plaintiff sued Defendant for race, gender, color, and national origin discrimination under Title VII (Count I); race, color, and national origin discrimination under 42 U.S.C. § 1981 (Count II); violations of the Americans with Disabilities Act (ADA) (Count III); violations of the Equal Pay Act (Count IV); violations of the Illinois Human Rights Act (IHRA) (Count V); and violations of the Illinois Wage Payment Collection Act (IWPCA) (Count VI). [1].

Plaintiff's Title VII and § 1981 claims arise from the same "operative facts" and the relevant elements and methods of proof are the same for both, so this Court addresses these claims together. *Montgomery*, 626 F.3d at 389. That analysis also encompasses Plaintiff's IHRA claim, except for the allegations relating to her disability. *See Rabe v. United Airlines, Inc.*, 971 F. Supp. 2d 807, 821 (N.D. Ill. 2013) (citing *Zaderaka v. Ill. Human Rights Comm'n*, 545 N.E.2d 684, 687 (Ill. 1989)).

This Court addresses Plaintiff's IHRA claim for disability discrimination with Plaintiff's ADA claims because the same analysis governs both. *See Hunt v. Guildhaus*, No. 1-14-3285, 2015 WL 5555019, at *7–8 (Ill. App. Ct. Sept. 21, 2015); *Zaderaka*, 545 N.E.2d at 687. Similarly, IHRA failure-to-accommodate claims

mirror ADA failure-to-accommodate claims, such that Illinois courts consult federal ADA case law in applying the IHRA. *See, e.g.*, *Owens v. Dep't of Human Rights*, 826 N.E.2d 539, 545–46 (Ill. App. Ct. 2005). To the extent that the analysis for the IHRA failure to accommodate claim materially differs, this Court addresses any such differences in its discussion of those claims.

Thus, this Court first addresses Plaintiff's race and gender discrimination claims, followed by her disability discrimination claims, before turning to her Equal Pay Act and IWPCA claims.

## A.     Race and Gender Discrimination

Plaintiffs asserting a Title VII employment discrimination claim—and analogous § 1981 and IHRA claims—must offer evidence that would "permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). Because the parties present their arguments within the burden-shifting framework established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), this Court first addresses Plaintiff's claims in those terms and then assesses the evidence cumulatively, applying the holistic approach set out in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). *See David*, 846 F.3d at 224.

### 1.     *McDonnell Douglas* Analysis

Under *McDonnell Douglas*, plaintiffs may offer direct evidence of discrimination—which "essentially requires an admission" by the employer that it acted "based on the prohibited animus"—or indirect evidence. *See Moss v.*

21

*Ameritech Servs., Inc.*, 166 F. App'x 849, 851 (7th Cir. 2006) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000)).  Plaintiff proceeds under the indirect method of proof, under which she must establish a prima facie case that: (1) she belongs to a protected class; (2) she performed reasonably on the job in accord with Defendant's legitimate expectations; (3) despite her reasonable performance, she was subjected to an adverse employment action; and (4) Defendant treated similarly situated employees outside of her protected class more favorably.  *See Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014), *overruled on other grounds by Ortiz*, 834 F.3d at 765.

Once a plaintiff establishes a prima facie case, the burden shifts to the employer to offer "a legitimate, non-discriminatory reason for the employee's termination."  *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002).  If the employer does so, it merits summary judgment unless the plaintiff presents evidence that the employer's explanation is pretextual.  *Id.*  Here, Defendant seeks summary judgment on the grounds that Plaintiff fails to establish her prima facie case and fails to demonstrate pretext.  *See* [28] at 4, 9; [46] at 8.

Before proceeding to this analysis, this Court notes that Plaintiff did not develop her claim for national origin discrimination under any framework.  The only persons whose national origins are identified in the record are Plaintiff, Castro, Liaw, and Wuang.  *See* DSOF ¶¶ 8–9; [28] at 4; [37] at 18; R. PSAF ¶ 1.  Plaintiff does not contend that these individuals constitute valid comparators or otherwise pursue this claim in her brief.  *See generally* R. DSOF; PSAF; [34].  Consequently,

Plaintiff waives this undeveloped argument. *See Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016).

### i) *Race*

The core of Plaintiff's race discrimination claim is that Defendant treated Slad and Chan—who are white and Asian, respectively—more favorably than her. *See* [34] at 7–8, 10. The adverse actions she complains of include her termination, her lower pay, and her frequent transfers. *See id.* at 9–10. Defendant argues that Plaintiff fails to show that she met Defendant's legitimate expectations or that her purported comparators were similarly situated. [28] at 4. Plaintiff argues that questions of fact remain as to her performance and that she need not identify a similarly situated employee under the Seventh Circuit's precedent on "mini-RIF" (reduction in force) cases. *See* [34] at 4–6.

With respect to Plaintiff's termination, this Court finds that Plaintiff has not created a genuine issue of material fact about her job performance. Defendant offers evidence that Plaintiff: (1) refused to adopt Slad's improved accounting procedures; (2) was uncooperative; (3) failed to meet deadlines; (4) was frequently absent or late and requested time off without notice; and (5) opposed a transfer to a different position despite underperforming in the accounting department. *See* DSOF ¶¶ 24, 47–62; [36] at 13–14, 17–18, 24; [36-2] at 17–18; R. DSOF ¶ 23; [29-5] at 7–8; [39-3] at 2. Whether Plaintiff's ability to meet deadlines related to her injuries is discussed in this Court's analysis of her disability claims; the remaining factors—excepting certain absences connected with her treatment—do not relate to

her condition and provide evidence of her substandard performance. *See, e.g.*, *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 752 (7th Cir. 2006).

Plaintiff contends that a genuine issue of material fact exists with respect to her use of Slad's procedures because Slad did not complete his templates for the new system until after her termination. [34] at 4. The record does reflect disagreement as to precisely when Slad implemented his new method using the revised templates. *See* [36-2] at 20; [36] at 13; [37] at 23. But Plaintiff does not dispute that Slad implemented other, interim measures before her termination that she refused to adopt. *See* R. DSOF ¶ 23; [36-2] at 17. In fact, she admits that she did not want to use Slad's methods because she claims they took longer than her own method. *See* R. DSOF ¶ 23.

Neither Plaintiff nor this Court may set Defendant's expectations; it is not "the province of the court to determine whether" Defendant's expectations were "fair, prudent, or reasonable," so long as they were nondiscriminatory. *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 464–65 (7th Cir. 2014). Thus, Plaintiff "cannot create a factual dispute" by arguing that Defendant *should* have allowed her to continue to use her old accounting methods; if Plaintiff failed to do what Defendant wanted her to do, she failed to meet Defendant's legitimate job expectations. *See id.*

Plaintiff's only other argument is that she should not have been fired for absenteeism because she did not take more vacation than she was entitled to, and because she received 60% for attendance on her 2015 performance review. *See* [34] at 5. Plaintiff does not explain how a 60% attendance rating is satisfactory, nor

does she rebut the record evidence showing that she failed to provide notice for her absences and ignored Castro's instructions to request time off through email rather than text. Again, it is not this Court's prerogative to set Defendant's attendance expectations. *See Widmar*, 772 F.3d at 464–65. Besides, even if Plaintiff shows "competency" in "certain aspects of her position," she cannot survive summary judgment if she does not "directly" counter Defendant's other, multiple reasons for her termination, including her failure to adopt Slad's more efficient procedures. *See Burks*, 464 F.3d at 753–54. She does not do so and thus fails to establish a prima facie case that her termination was discriminatory. *See Peele*, 288 F.3d at 328.

Plaintiff next argues that Defendant discriminated on the basis of race by paying her less than Chan and Slad. [34] at 9, 10. On this claim, Plaintiff fails to show that either Chan or Slad were similarly situated. A similarly situated employee "must be directly comparable" to Plaintiff "in all material respects." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 981 (7th Cir. 2014). Relevant factors include whether the employees "held the same position, had the same supervisor," and were "subject to the same standards." *Id.* Differences in "experience, education, and qualifications" are also relevant, as long as "the employer took them into account when making" its decisions. *Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 802 (7th Cir. 2014). Whether an employee was similarly situated is "typically a question for the factfinder," but the employer merits summary judgment where, as here, "no reasonable jury could find the plaintiff has met her burden." *Id.*

First, Plaintiff offers almost no evidence about Chan whatsoever. The raw data of Plaintiff's and Chan's salaries mean nothing absent evidence of Chan's performance, supervisors, education, experience, qualifications, and her tasks within each of the multiple positions Chan held with Defendant—none of which Plaintiff offers. Thus, Plaintiff fails to meet her burden as to Chan. *See id.*

With respect to Slad, the parties agree that Slad received $0.80 more per hour while both he and Plaintiff worked in accounting. *See* DSOF ¶¶ 6, 13. But Plaintiff fails to rebut Defendant's evidence that it determined pay based upon "qualifications and job experience." *See* [29-8] at 73. And Plaintiff does not contest Slad's higher level of experience, demonstrated by the years of experience in financial management and data analysis on Slad's resume. *See* [29-8] at 35–36; [39-5] at 2–3. Nor does Plaintiff contest the testimony from Slad, Castro, and Liaw that Defendant hired Slad specifically for his analysis and software skills, which he used to create and implement the revised templates. *See* [36-2] at 9, 11–12; [37] at 17; [38] at 19. Plaintiff contends only that she also attempted to devise efficiencies in her accounting process and that Defendant rejected her efforts. *See* [37] at 19–20. But this Court cannot demand that Defendant adopt one procedure over another; the courts do not constitute "a super-personnel department that second-guesses" facially legitimate business decisions. *Widmar*, 772 F.3d at 464. Nothing prevented Defendant from deciding to take advantage of and reward Slad's experience in data analysis and management, or from paying Slad slightly more to take on data

analysis responsibilities—duties that Plaintiff admits she never carried out for Defendant. *See* [37] at 19.

In sum, Defendant offers "unrebutted, nondiscriminatory reasons for the pay disparity" between Slad and Plaintiff, including their divergent levels of experience and differing responsibilities for the period of Plaintiff's employment; this dooms Plaintiff's claim as to her allegedly discriminatory pay rate. *See Cullen v. Ind. Univ. Bd. of Trs.*, 338 F.3d 693, 704 (7th Cir. 2003).

As to Plaintiff's allegedly discriminatory transfers, Plaintiff fails to develop this claim or identify a similarly situated employee. *See generally* R. DSOF; PSAF; [34] at 10. Plaintiff only identified Chan and Slad as potential comparators; but Slad is not similarly situated and Defendant did not even hire Slad until after the last of Plaintiff's transfers. *See* DSOF ¶ 13; R. DSOF ¶ 5. As such, Chan is the only relevant comparator. *See, e.g., DeJesus v. Contour Landscaping, Inc.*, 763 F. Supp. 2d 1029, 1041 (N.D. Ill. 2011). But as discussed above, Plaintiff offers negligible evidence about Chan or her employment with Defendant, and certainly nothing that establishes that Chan was similarly situated. Plaintiff thus fails to meet her burden of demonstrating that a similarly situated employee was treated more favorably with respect to in-house transfers. *See Langenbach*, 761 F.3d at 802.

Finally, even if Plaintiff established her prima facie case as to any of these adverse actions, Plaintiff does not show that Defendant's explanations constitute pretext. Because Defendant offers legitimate reasons for Plaintiff's pay rate and termination, the burden would revert to Plaintiff to show that Defendant's decisions

"were actually pretext for illegal discrimination." *Widmar*, 772 F.3d at 465. To do so, Plaintiff must raise "a genuine issue about the honesty, not the accuracy," of Defendant's stated rationales. *Id.*

Plaintiff argues that Defendant's explanations for her termination are pretextual for two reasons: first, because Defendant did not eliminate Plaintiff's position, as it claimed, but replaced her; and second, because Defendant cannot produce the performance evaluation that Castro recalled completing for Plaintiff. [34] at 11. (Plaintiff does not offer any evidence of pretext as to her pay or transfers. *See id.*) This Court addressed the evaluation issue in discovery: no evidence indicated that another evaluation ever existed. *See* [21, 24]. Plaintiff offers no new evidence on this topic. In any event, Castro repeatedly complained to her superiors about Plaintiff's performance and Liaw testified that he took Castro's feedback into account when completing Plaintiff's 2015 performance review. *See* [36] at 17–18, 24; [38] at 19, 20. These facts fail to support Plaintiff's characterization of Liaw's evaluation as dishonest, *see Widmar*, 772 F.3d at 465, and Plaintiff does not offer any other evidence to substantiate her claim of pretext.

And whether Defendant "eliminated" Plaintiff's position or "replaced" her here represents a distinction without a difference. Showing pretext requires showing that the stated reason for an employee's termination "is a lie that masks a discriminatory motive." *Davenport v. Northrop Grumman Sys. Corp.*, 281 F. App'x 585, 588 (7th Cir. 2008) (citing *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006)). Plaintiff proves neither the lie nor the motive.

Defendant claims that it terminated Plaintiff because she failed to meet its expectations in the areas discussed above. That explanation accords with Plaintiff's existing 2015 performance evaluation and with Castro's observations and testimony, and has not wavered in Defendant's briefs or depositions. *See, e.g.*, [28] at 8–10; [36-3] at 8; [38] at 18–20, 23–24. Such consistency undermines Plaintiff's claim of pretext. *Cf. Widmar*, 772 F.3d at 465 (To show pretext, plaintiffs must identify "weaknesses, implausibilities, inconsistencies, or contradictions in the defendant's proffered reasons" that make them "unworthy of credence.").

As to whether Plaintiff's position was "eliminated" or Slad "replaced" her, both appear to be true to some degree. Plaintiff does not dispute that Defendant hired Slad in November 2015 to implement more efficient accounting procedures, and that he did so. *See* DSOF ¶ 13; R. DSOF ¶ 15; [36] at 11–12, 18; [36-2] at 9, 11–12; [38] at 19. Nor does she dispute that she failed to adopt Slad's interim efficiency measures. *See* R. DSOF ¶ 23; [36-2] at 17; [36] at 13–15. Liaw stated:

> So with Frank on board he was able to have the new procedure and making the process a lot faster and more accurate, and with Diana refuse to learn that new process we just decided we no longer need someone here to use the old method to apply the payment . . . Instead we wanted someone with like better Excel skill and willing to learn the new method . . . And so basically we eliminate the basic account receivable role for the company because we found a better, faster, more accurate way to process the account receivable payment process.

[38] at 22. An employer may legitimately determine that one employee better suits its needs, that one employee is more qualified for a specific task, or even that having some employees absorb the duties of another more efficiently serves the employer's interest. *See Scruggs v. Garst Seed Co.*, 587 F.3d 832, 839–40 (7th Cir.

2009); *Davenport*, 281 F. App'x at 588. Absent other evidence, such decisions do not show pretext. *See Scruggs*, 587 F.3d at 839–40.

Here, the record confirms that Defendant sought to improve its accounting procedures, that it hired Slad to fulfill this task, and that he did so. As a result, Defendant terminated an employee who did not fulfill this role and who actively resisted adopting more efficient procedures. Minor inconsistencies in the *characterization* of Plaintiff's termination do not show that the *reasons* for it were pretextual. *See Davenport*, 281 F. App'x at 589; *see also Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 577 (7th Cir. 2015) (collecting cases); *O'Connor v. DePaul Univ.*, 123 F.3d 665, 671 (7th Cir. 1997) (employer's "flux in terminology" does not show pretext where its explanations center on the same underlying conduct).[8]

Moreover, Plaintiff offers no evidence that any such discrepancy was a "mask for discrimination," *Widmar*, 772 F.3d at 465, which is part of Plaintiff's burden on the pretext inquiry, *see id.*; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515–16 (1993) (An employer's explanation "cannot be proved to be a pretext *for discrimination* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.") (internal quotation marks omitted). Because Plaintiff presents no evidence that Defendant did not "honestly believe" its reasons for firing her and instead acted upon discriminatory motives, she fails to demonstrate pretext. *Castro*, 786 F.3d at 576–77; *see also Widmar*, 772 F.3d at 465.

Finally, Plaintiff asserts generally that Defendant's favorable treatment of

---

[8] This Court also finds semantic distinctions particularly unhelpful here, given that Liaw admits that he used an online template to draft Plaintiff's termination letter and English is not his first language.

similarly situated employees shows pretext. *See* [34] at 9, 11. Again, however, Plaintiff only points to Chan and Slad. *See id*. This Court already explained that Plaintiff offers insufficient evidence about Chan to prove much of anything and with respect to Slad, Plaintiff fails to show that he compares to Plaintiff "in all material respects." *Alexander*, 739 F.3d at 981. Because he reported to someone else in Defendant's hierarchy, had more experience, and held different responsibilities and qualifications, he is not similarly situated. *See, e.g., Wells-Griffin v. St. Xavier Univ.*, 26 F. Supp. 3d 785, 796–97 (N.D. Ill. 2014) (employees were not similarly situated where their responsibilities differed in kind). Plaintiff's lack of a valid comparator makes it impossible to show here—absent more direct evidence—that Defendant's actions were based upon a discriminatory animus. *See Senske v. Sybase, Inc.*, 588 F.3d 501, 510 (7th Cir. 2009) (Comparators "must be similar enough that differences in their treatment cannot be explained by other variables, such as distinctions in their roles or performance histories."). In any event, Slad was fired shortly after Plaintiff for absenteeism, which hardly shows favorable treatment. *See* DSOF ¶ 21; [37-1] at 2.

Because Plaintiff fails to establish her prima facie case, and, in any event, does not show pretext, she fails to demonstrate racial discrimination under the *McDonnell Douglas* framework. *See, e.g., Montgomery*, 626 F.3d at 389, 396–97.

### ii) *Gender*

The same operative facts underpin Plaintiff's claims for gender discrimination, with the obvious caveat that Plaintiff cannot offer Chan (who is also a woman, and thus within the protected class) as a valid comparator for these

claims. *See, e.g.*, *Andrews*, 743 F.3d at 234. Thus, insofar as Slad remains Plaintiff's only comparator, her claims of gender discrimination fail for the same reasons her claims of race discrimination do. As discussed, she fails to show that she met Defendant's legitimate expectations or that its reasons for her termination were pretextual. To the extent that Plaintiff's claims for gender discrimination arise from the period preceding Slad's employment, they fail because she identifies no male comparators for that period. *See id.; DeJesus*, 763 F. Supp. 2d at 1041.

Accordingly, Plaintiff fails to establish gender discrimination under the *McDonnell Douglas* framework. *See, e.g. Langenbach*, 761 F.3d at 802.

### 2. *Ortiz* Analysis

Under *Ortiz*, courts "assess cumulatively all the evidence presented to determine whether it permits a reasonable factfinder to determine" that the employer's adverse actions are attributable to a proscribed factor. *David*, 846 F.3d at 224. Under this analysis, Plaintiff also fails to demonstrate discrimination.

With respect to racial discrimination, Plaintiff offers a host of uncorroborated anecdotes of her allegedly discriminatory treatment. *See, e.g.*, R. DSOF ¶ 72. Although uncorroborated testimony can prevent summary judgment when it is based upon personal knowledge, "mere conclusory allegations do not constitute evidence." *Montgomery*, 626 F.3d at 389. Plaintiff's allegations are either conclusory, speculative, or simply fail to show discrimination, and thus cannot avert summary judgment. *See id.*

For example, Plaintiff claims that, while she and Chan held similar positions, Chan got more travel opportunities and Liaw often overruled Plaintiff's decisions

but not Chan's. *See* R. DSOF ¶ 72; [37] at 15. But the only record evidence about Chan shows that Plaintiff reported to Chan when she was first hired, [36-3] at 8, indicating that Chan had either more experience, seniority, or both. Plaintiff offers no evidence beyond speculation that Defendant's actions resulted from discrimination. *See generally* R. DSOF; [37] at 15–18. Additionally, given Plaintiff's failure to connect these actions with any "material" consequences, it is unclear that such anecdotes depict anything approaching a disputable "adverse action": mere "snubbing by supervisors" is not actionable under Title VII. *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1107 (7th Cir. 2012).

Similar flaws plague Plaintiff's claim that Defendant unfairly and frequently transferred her. *See* R. DSOF ¶ 72; [37] at 13. Here, Plaintiff fails to show that the transfers constitute adverse actions when she offers no evidence about how her responsibilities changed in these different positions, and in light of the fact that Defendant granted her regular raises throughout the challenged period. *See* [38-4]; *Chaudhry v. Nucor Steel-Ind.*, 546 F.3d 832, 838 (7th Cir. 2008) (adverse actions require "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."); *Han v. Whole Foods Mkt. Grp.*, 44 F. Supp. 3d 769, 788 (N.D. Ill. 2014) (failure to promote an employee qualifies as adverse only if the promotion would have entailed a raise). In fact, Plaintiff's statements show that her central complaint is merely that she disliked working in the warehouse. *See* [37] at 14–15. But as the Seventh Circuit has repeatedly

reminded plaintiffs, not everything "that makes an employee unhappy is an actionable adverse action." *Brown*, 700 F.3d at 1106. Quite simply, Plaintiff fails to demonstrate that her transfers were "materially" adverse, and therefore, they are not actionable under Title VII. *See id.* And again, Plaintiff offers no evidence that the transfers can be attributed to discriminatory motives.

In light of this record noted above, this Court need not further address each and every such allegation individually. Suffice it to say that the remainder of Plaintiff's allegations of racial discrimination are either unsupported by the record (as when Hernandez recanted her allegations that Defendant offered non-Hispanic employees more favorable leave policies), do not show discrimination (for example, Plaintiff's claim that non-Hispanic employees received more flexible hours when her only examples were employees in managerial positions), or consist of conclusory allegations (as when Plaintiff claimed that Defendant's firing of other Hispanic employees shows discrimination, based solely upon a list of terminated employees and absent any evidence that their terminations were disproportionate or otherwise unwarranted). *See generally* R. DSOF ¶ 72; Section I.C, *supra*.

The same is true of Plaintiff's allegations of gender discrimination. Most of these have already been addressed, insofar as they mirror her claims of racial discrimination or pertain to Slad's employment. *See, e.g.*, R. DSOF ¶ 71. Plaintiff also claims that Defendant offered Alberto Landeros a bonus after his termination but did not offer one to her. *Id.*; [37] at 26. But Plaintiff offers no facts about the circumstances of Landeros' termination and admits that Defendant awarded

34

bonuses on a discretionary basis. *See* [37] at 26; [27-1] at 17. Plaintiff's claim that Defendant only gave written performance reviews to its female employees, *see* R. DSOF ¶ 71, distorts Wuang's testimony, as discussed above. *See* Section I.C, *supra*. Finally, the record does not support Plaintiff's contention that Defendant offered Slad—but not Plaintiff—a chance to complete a performance improvement plan before terminating him. Rather, Mendoza issued Slad two written warnings, one of which stated cryptically that he was "on performance improvement," but Defendant never initiated or followed a plan and fired Slad shortly thereafter. *See* [36-2] at 5–7; DSOF ¶ 21. In any event, Plaintiff offers no evidence that this—or any other—decision was motivated by a prohibited animus.

In short, the record shows only that Defendant and Plaintiff had a mutually unhappy employment relationship. The evidence would not "permit a reasonable factfinder to conclude" that Plaintiff's race or gender motivated Defendant's actions. *David*, 846 F.2d at 224. Accordingly, this Court grants summary judgment to Defendant on Plaintiff's claims for race, gender, and national origin discrimination under Title VII, § 1981, and the IHRA. *See id.; see also Celotex*, 477 U.S. at 323.

### B. Disability Claims

#### 1. Disability Discrimination

Plaintiff claims that Defendant terminated her because of her injuries in violation of the ADA and the IHRA. *See* [1] ¶¶ 47–53, 63–73. Defendant concedes for the purposes of its motion that Plaintiff has a disability. *See* [28] at 11. As with race and gender discrimination, plaintiffs may prove disability discrimination "using either the direct or indirect method of proof." *Dickerson v. Bd. of Trs. of*

35

*Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011); *Hunt v. Guildhaus*, 2015 WL 5555019, at *7–8 (same methods apply to IHRA disability claim).

Here, Plaintiff relies upon the direct method of proof. *See* [34] at 14. This method requires either "an admission by the decision maker that his or her actions were based upon the prohibited animus," or sufficient circumstantial evidence permitting a jury to "infer intentional discrimination." *Dickerson*, 657 F.3d at 601. Relevant circumstantial evidence includes: (1) suspicious timing; (2) "ambiguous statements or behavior toward other employees in the protected group;" (3) evidence "that similarly situated employees outside of the protected group systematically receive better treatment;" and (4) "evidence that the employer offered a pretextual reason for an adverse employment action." *Id.* Plaintiff's evidence must show that her disability *caused* her termination. *See id.*; *see also Sneed v. City of Harvey*, 6 F. Supp. 3d 817, 832 (N.D. Ill. 2013).[9]

Plaintiff offers no direct evidence of disability discrimination. *See* [34] at 14. Rather, Plaintiff's primary evidence of intentional discrimination boils down to the fact that Defendant fired her in part for absenteeism and untimely work, which Plaintiff states were due to her disability. *See* [34] at 14. True, Defendant cited both absenteeism and untimely work as reasons for Plaintiff's termination. But Plaintiff admits that she missed five days of work for personal reasons, arrived late

_____

[9] The parties do not raise the issue—as yet undecided in this circuit—of whether the 2008 ADA amendments, which now prohibit discrimination "on the basis" of a disability rather than "because of" a disability, alter the causation standard. *See Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 853 n.2 (7th Cir. 2015). Where the parties do not present the issue, the Seventh Circuit has continued to apply the "but for" causation standard. *See Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017). In any event, as explained below, Plaintiff fails to offer any viable evidence of causation. Thus, addressing the issue "would not affect the outcome" here, and this Court need not resolve it on the present motion. *Hooper*, 804 F.3d at 853 n.2.

on another seven for similar or unexplained reasons, and then took four days' vacation immediately after requesting another twelve days off, all within a few short months.  *See* DSOF ¶¶ 51–65; R. DSOF ¶ 65.

Here, firing Plaintiff for absenteeism would not violate the ADA since the act does not protect absences for unrelated illness, family emergencies, or other extraneous reasons.  *See Kazmierski v. Bonafide Safe & Lock, Inc.*, 223 F. Supp. 3d 838, 845 (E.D. Wis. 2016).  Moreover, a violation "of a workplace rule, even if it is caused by a disability, is no defense to discipline up to and including termination." *Guzman v. Brown Cnty.*, --- F.3d ---, 2018 WL 1177592, at *6 (7th Cir. 2018) (internal quotation marks omitted) (finding that a pattern of tardiness in violation of company policy provided nondiscriminatory grounds to fire the plaintiff).  Finally, Plaintiff does not show that Defendant's actions "systematically" favored able-bodied persons or constituted a pretext for discrimination, undermining her ability to raise an inference of discrimination.  *See Dickerson*, 657 F.3d at 601.

As to Plaintiff's untimely work, she testified that her injuries affected her pace.  *See* R. DSOF ¶ 24 (citing [37] at 21).  But Plaintiff does not explain when her injuries affected her work and she admits that pain in her hand slowed her down on only a "couple of days."  *See* [37] at 22.  Additionally, Plaintiff offers no evidence that anyone other than Castro even knew about this limitation.  *See* [37] at 21–22. Since Plaintiff's argument is, essentially, that Liaw's reasons for firing her were pretextual, her failure to indicate that he knew of this restriction dooms this claim. *See, e.g., Nehan v. Tootsie Roll Indus., Inc.*, 54 F. Supp. 3d 957, 974–75 (N.D. Ill.

2014). And, as discussed above, Plaintiff does not rebut Defendant's evidence that she refused to adopt Slad's interim improvements, which Liaw made clear affected Plaintiff's performance evaluation and slowed down her work. *See* [38] at 19. Thus, Plaintiff does not connect her injury to her termination with respect to either motive or timing, or via any of the other types of circumstantial evidence used in discrimination cases. *See Dickerson*, 657 F.3d at 601.

This Court's analysis does not change under *Ortiz*'s cumulative assessment of the evidence. *David*, 846 F.2d at 224. In short, Plaintiff fails to "show any type of connection between any alleged discriminatory animus" by Defendant and her termination. *Hooper*, 804 F.3d at 855. This Court grants Defendant summary judgment on Plaintiff's claims for disability discrimination under the ADA and the IHRA.

### 2.    Failure to Accommodate

To show that Defendant failed to accommodate her in violation of the ADA, Plaintiff must establish that: (1) she is a qualified individual with a disability; (2) Defendant knew of her disability; and (3) Defendant failed to reasonably accommodate the disability. *See Brumfield v. City of Chicago*, 735 F.3d 619, 631 (7th Cir. 2013).

In general, "an employer is not obligated to accommodate an employee's disability until the employee informs the employer of the existence of the disability and requests an accommodation." *Guzman*, 2018 WL 1177592, at *6 (citing *Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899 (7th Cir. 2000)). The request need not be formal or explicit. *E.E.O.C. v. Sears, Roebuck &*

*Co.*, 417 F.3d 789, 803 (7th Cir. 2005). Ordinarily, that request triggers an "interactive process" between employer and employee "to determine the extent of the disability and what accommodations are appropriate and available." *Id.* (internal quotation marks omitted); *see also Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 813 (7th Cir. 2015) (plaintiff "typically must *request* an accommodation for his disability in order to claim that he was improperly *denied*" an accommodation). Under certain circumstances, however, an employer aware of an employee's difficulties may remain obliged to initiate the interactive process, even absent a request for accommodation. *See Jovanovic*, 201 F.3d at 899; *Bultemeyer v. Ft. Wayne Cmty. Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996) (where an employee suffers from a mental illness, employer who is "aware of the difficulties" must help the employee "determine what specific accommodations" are necessary).

Plaintiff contends that Defendant failed to reasonably accommodate her requests for additional time to complete assignments, time off to attend medical appointments, and absences relating to her injury. *See* [34] at 13. But the undisputed facts show that Defendant granted Plaintiff's requests to attend doctor appointments and Plaintiff never missed an appointment. *See* R. DSOF ¶ 44; DSOF ¶¶ 42–44. Plaintiff offers only one, self-contradicting anecdote of an occasion when Castro allegedly denied her permission to attend an appointment, but admits that she attended it anyway. *See* [37] at 21; *see also* R. DSOF ¶ 39. Moreover, reasonable accommodation "is a process, not a one-off event," and thus, a single disagreement relating to one appointment cannot constitute a failure to

accommodate, particularly where Plaintiff attended all of her appointments regardless. *See Cloe v. City of Indianapolis*, 712 F.3d 1171, 1178 (7th Cir. 2013), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996).

Finally, the record shows that Defendant let Plaintiff use a different chair and switch screens on her monitor rather than flip through hard copies of her work materials. *See* DSOF ¶ 41; [37] at 22. To the extent that Plaintiff's failure-to-accommodate claim arises from these requests, Defendant merits summary judgment because no reasonable jury could find that Defendant failed to reasonably accommodate her. *See Preddie*, 799 F.3d at 813; *Anderson*, 477 U.S. at 248.

Plaintiff's claim survives, however, with respect to her request for additional time to complete assignments. Plaintiff offers unrebutted evidence that she made this request. *See* [37] at 22; DSOF ¶ 41. Defendant offers no evidence that it directly addressed this request, other than to say that Castro permitted Plaintiff to view all her materials on her computer monitor. *See* DSOF ¶ 41. Although this concession may have related to Plaintiff's ability to complete her work, it does not directly address Plaintiff's actual request, which was to receive extended deadlines for as long as her injuries affected the pace of her work. *See* [37] at 22.

Under the ADA, once an employee requests an accommodation, the employer must "engage in an interactive process to determine a reasonable accommodation." *Sears*, 417 F.3d at 797. The employer must seek to provide an accommodation that "effectively accommodates the disabled employee's limitations." *Id*. at 802. Under

the IHRA, after an employee requests an accommodation, "it becomes the burden of the employer to show that there is no possible reasonable accommodation or that the employee would be unable to perform the job even with the accommodation." *See Ill. Dep't of Corr. v. Ill. Human Rights Comm'n*, 699 N.E.2d 143, 146–47 (Ill. App. Ct. 1998). Here, the record remains unclear as to what discussions Plaintiff had with Castro about receiving extensions on her work, and whether Defendant's purported accommodation—allowing Plaintiff to use a slower method of completing her work—actually or reasonably accommodated Plaintiff's disability. *See* [37] at 22; DSOF ¶¶ 41, 44. Accordingly, this Court denies summary judgment on Plaintiff's failure-to-accommodate claim only with respect to her request for additional time to complete her work.

### C.    Equal Pay Act

To establish a prima face case of wage discrimination under the Equal Pay Act, Plaintiff must show that: "(1) higher wages were paid to a male employee, (2) for equal work requiring substantially similar skill, effort and responsibilities, and (3) the work was performed under similar working conditions." *Cullen*, 338 F.3d at 698. To show that the work was "equal," Plaintiff must show that the positions shared a "common core" of tasks. *Id*. If Plaintiff does so, Defendant bears the burden of showing that the pay disparity stemmed from "a differential based on any other factor other than sex." *Wollenburg v. Comtech Mfg. Co.*, 201 F.3d 973, 976 (7th Cir. 2000). If Plaintiff fails to call the validity of Defendant's rationale into question, Defendant merits summary judgment on this claim. *See id*.

Here, Plaintiff claims that Slad received higher wages in violation of the Act.

*See* [34] at 15.  But Plaintiff's brief fails to develop this argument and merely cross-references her analysis as to whether they are similarly situated under Title VII.  *See id.*  Title VII and Equal Pay Act claims require different analysis, however.  *See, e.g., Cullen*, 338 F.3d at 698, 703; *see also Cnty. of Washington v. Gunther*, 452 U.S. 161, 178–80 (1981) (noting that Title VII has broader coverage for equal pay claims than the Equal Pay Act does).  Such "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived."  *Crespo*, 824 F.3d at 674 (internal quotation marks omitted).

In any event, Plaintiff admits that Slad had the additional task of creating a new, more efficient method of processing customer payments, which did not form part of Plaintiff's responsibilities.  *See* R. DSOF ¶¶ 15, 17.  The fact that Defendant required Slad to "create and launch" a revised accounting system means that he did not have the same responsibilities as Plaintiff.  *See Cullen*, 338 F.3d at 699–700.  Thus, Plaintiff has not made out a prima facie case of wage discrimination.  *See id.* at 700.  Even if she had, Defendant has explained that the pay disparity between Slad and Plaintiff resulted in part from Slad's greater experience, as discussed above.  "Experience is a nondiscriminatory reason for wage disparity."  *Wollenburg*, 201 F.3d at 976.  Plaintiff fails to call that explanation into question, nor does any evidence in the record suggest its falsity.  Accordingly, Defendant merits summary judgment on Plaintiff's Equal Pay Act claim.  *Id.*

### D.    IWPCA

Under the IWPCA, Plaintiff may recover earned wages from Defendant if Defendant owes those wages pursuant to an employment agreement.  *Enger v. Chi.*

42

*Carriage Cab Corp.*, 812 F.3d 565, 568 (7th Cir. 2016) (citing 820 ILCS 115/2–3). The IWPCA does not create a substantive right to any particular type of pay, but merely "entitles workers to the compensation owed under their employment agreement." *Almy v. Kickert Sch. Bus Line, Inc.*, 722 F.3d 1069, 1075 (7th Cir. 2013) (citing § 115/2). Under the IWPCA, "agreement" means only that both sides mutually assented to the terms, so parties may enter an agreement "without the formalities and accompanying legal protections of a contract." *Hess v. Kanoski & Assocs.*, 668 F.3d 446, 452 (7th Cir. 2012) (citation omitted). Here, the relevant agreement consists of Defendant's relevant employee handbooks.[10] *See* [28] at 14–15; DSOF ¶¶ 31, 32; [1] ¶ 77.

In her complaint, Plaintiff claimed that Defendant owed her unpaid vacation days and a bonus under the terms of the handbook. [1] ¶¶ 77–82. As to the bonus, the only evidence in the record shows that the 2013 Handbook made bonuses entirely discretionary, and the 2015 Handbook does not mention bonuses at all. *See* [27-1] at 17, 28–62. Bonuses that are not "guaranteed" by an agreement are understood to be discretionary; Plaintiff's failure to "upset that understanding" defeats her claim that Defendant owes her a bonus. *See Stark v. PPM Am., Inc.*, 354 F.3d 666, 672–73 (7th Cir. 2004) (applying the IWPCA). In any event, Plaintiff's failure to pursue, defend, or address this claim in her response brief

---

[10] In some circumstances, employee handbooks may not constitute employment agreements for purposes of the IWPCA. *See Brown v. DS Servs. of Am., Inc.*, 246 F. Supp. 3d 1206, 1222 (N.D. Ill. 2017). But neither party argues that such circumstances apply here and each side agrees that Defendant's handbooks govern Plaintiff's vacation accrual. *See* R. DSOF ¶¶ 31, 32. Since employees and employers can "set the material terms" of an employment agreement "by acting in a manner consistent with an employment agreement," this suffices for present purposes. *Landers-Scelfo v. Corp. Office Sys., Inc.*, 827 N.E.2d 1051, 1059 (Ill. App. Ct. 2005).

entitles Defendant to summary judgment. *See* [34] at 15; *Palmer v. Marion Cnty.*, 327 F.3d 588, 597–98 (7th Cir. 2003) (non-moving party abandons claim by failing to respond to motion for summary judgment in its opposing brief).

Plaintiff also fails to respond to Defendant's evidence that it paid Plaintiff for the vacation time it owed her; she merely asserts that the raw data in Defendant's payroll records show that some time remains owing. [34] at 15. But such "undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." *Crespo*, 824 F.3d at 674 (internal quotation marks omitted).

Besides, Plaintiff fails to create a genuine issue of material fact as to the amount of vacation that Defendant owed her because the payroll records she cites do not contain her full pay history and do not otherwise indicate or describe what policy governed her leave accrual. *See* R. DSOF ¶¶ 66, 68; [38-1]. Nor, as she claims, did Liaw testify that the 2015 Handbook applied in 2014, increasing her accrued vacation time. *See* R. DSOF ¶ 66. Liaw merely stated that the formula he was looking at—in the 2015 Handbook—*would* have awarded Plaintiff 13 days in 2014; he does not say that the 2015 Handbook *applied* in 2014. *See* [38] at 58. Plaintiff offers no other evidence that the 2015 Handbook applied before its July 13, 2015 publication. *See* [27-1] at 28. As a result, this Court disregards her insufficient denial of Defendant's statement of fact, which is supported by record evidence showing that Plaintiff used 8 of the 14 vacation days to which she was entitled in 2015. *See* DSOF ¶¶ 4, 32, 67; [27-1] at 55–56. Nor does Plaintiff cite evidence contradicting Defendant's statement that it paid out the six remaining

days following her termination. *See* DSOF ¶ 68; *Malec*, 191 F.R.D. at 584.

In short, Plaintiff fails to show that Defendant owes her compensation pursuant to any employment agreement, and this Court grants Defendant summary judgment on Plaintiff's IWPCA claim. *See Brown*, 246 F. Supp. 3d at 1222–23.

## IV. Conclusion

This Court partially grants and partially denies Defendant's motion for summary judgment [26]. This Court grants Defendant's motion for Counts I, II, IV, and VI; for Plaintiff's disability discrimination claims under Counts III and V; and for Plaintiff's race, national origin, color, and gender discrimination claims under Count V. This Court denies summary judgment only as to Plaintiff's failure-to-accommodate claims under Counts III and V. The motion hearing set for April 12, 2018, is converted to a status hearing. All other dates and deadlines stand.

Dated:  March 27, 2018

Entered:

John Robert Blakey
United States District Judge